# FENROY A. FOX

## V.

# MANUEL DEESE, ET AL.

Record No. 841351

November 25, 1987

Present: All the Justices

414

*John H. Herbig (Tuck, Freasier & Herbig*, on brief), for appellant.

*John K. Burke, Jr.; Reginald M. Barley*, Senior Assistant City Attorney *(D. Eugene Webb, Jr.; Mays, Valentine, Davenport & Moore*, on briefs), for appellees.

STEPHENSON, J., delivered the opinion of the Court.

Fenroy A. Fox, individually and trading as Hosea Productions, filed an eight-count amended motion for judgment against the City of Richmond (the City); Manuel Deese, Richmond's City Manager; Jerry N. Johnson, Director of the City's Department of Community Facilities; Grady James Mathias, Assistant Director of the City's Department of Community Facilities; and Jack Fulton, the City's Director of Public Safety. Counts I, II, III, V, and VI sound in tort, and Counts IV, VII, and VIII sound in contract.

The trial court sustained "demurrers to all eight counts by all of the defendants . . . without leave to amend." The court also sustained the "special pleas of estoppel . . . to all [eight] counts," and the "special pleas of immunity as to Counts I, II, III, V and VI." In sustaining the demurrers and pleas, the trial court stated that it did so "[f]or the reasons stated by the various defendants in their memoranda, as well as in their oral presentation in court." The trial court entered an order dismissing Fox's case with prejudice. In this appeal, Fox challenges all the trial court's rulings.[1]

# I
## ALLEGED FACTS AND CLAIMS.

The facts alleged in Fox's amended motion for judgment are as follows.[2] Fox is engaged in the business of producing and promoting shows and concerts in the various facilities available throughout the Richmond area. Deese, at all times relevant to this action, was Richmond's City Manager. Mathias was Acting Director of

---

[1] In this appeal, however, Fox does not challenge the dismissal as it relates to Fulton.

[2] As to all defenses raised by demurrer, we will apply the rule that a demurrer admits the truth of all material facts well pleaded, including facts expressly alleged and all reasonable inferences arising therefrom. *Bowman v. State Bank of Keysville*, 229 Va. 534, 536, 331 S.E.2d 797, 798 (1985).

the City's Department of Community Facilities until June 23, 1980, when he became the Assistant Director of that department. Johnson became the City's Director of Community Facilities on or about June 23, 1980.

In late May and early June 1980, Fox engaged in a series of meetings with Deese, Mathias, and Fulton relative to Fox's promotion of an outdoor "Mardi Gras" concert scheduled to be held at the City Stadium on July 4 and 5, 1980. At these meetings, the parties discussed the terms and conditions Fox had to meet to secure the use of the City Stadium for the concert. Deese made handwritten notes of the requirements agreed upon in these discussions and gave the notes to Fox. On June 2, 1980, at the conclusion of the final meeting, Deese directed Mathias to prepare a written contract reflecting the requirements contained in the handwritten notes of that meeting. Fox was assured that he could hold the Mardi Gras concert at the City Stadium if he met these requirements. Further, he was instructed to secure written contracts with all concert performers by June 16, 1980.

Based on this representation, Fox, on his own behalf and through his agents, contracted with various performers and with light and sound crews at a cost of approximately $125,642. Because Fox was required to protect the stadium field from damage, he also made arrangements to rent a field cover at a cost of $17,979.79.

Mathias prepared a written contract dated June 10, 1980, which he first presented to Fox on June 13, 1980. The terms and conditions of this contract differed significantly from the requirements set forth in Deese's notes. The written contract contained charges and additional expenditures never previously discussed, including clean-up costs (traditionally borne by the City out of its rental fee), an additional payment to the City of 3% on all ticket sales, and a $25,000 deposit for City Police security. On numerous occasions, Fox requested Deese to remove these new conditions; Deese, however, refused to do so, and on or about June 19, 1980, he told Fox that any changes would have to be made by Mathias.

Had Fox been aware of these additional requirements prior to committing himself to pay approximately $143,000, he would have either cancelled the concert or held it elsewhere. By this time, however, Fox was not in a position to change his plans due to the commitments and expenditures he already had made. Thus,

Fox was in a position from which he could not retreat and ultimately was forced to agree to the new requirements.

Additionally, Mathias represented to Fox that it was City policy to pay the City's staff double time on July 4th, and time and a half on July 5th. This representation was incorrect, and Mathias knew or should have known it was not City policy. Relying upon Mathias' misrepresentation, Fox agreed to this pay provision in the written contract, which resulted in an overcharge to Fox of $3,173.42.

Beginning on June 16, 1980, and thereafter, Mathias also repeatedly assured Fox that concert tickets were on the computer, ready for sale. Tickets were not placed on sale, however, until on or about July 1, 1980, just three days before the concert. Relying upon Mathias' assurances, Fox spent $27,000 for advertising. Because tickets were not ready for sale as represented by Mathias, this expenditure was wasted.

Mathias was supposed to have had the contract prepared by June 6, 1980; however, he intentionally delayed its preparation and did not present the contract to Fox until June 13, 1980. On June 16, 1980, Fox went to Mathias in an attempt to get him to execute the contract. Mathias, however, refused to sign the contract and referred Fox to Deese. On June 19, 1980, Deese referred Fox back to Mathias, and on that date, Fox again approached Mathias in an effort to get him to execute the contract. Mathias, however, suggested that they wait until they could get all parties together, including Joseph Baldacci, who ran the Richmond Concessionaire.

On June 23, 1980, Fox met with defendants Mathias, Deese, Johnson, and Fulton. Baldacci and two other men were also present at the meeting. At that time, Mathias purportedly signed the contract and gave it to Fox. Mathias, in fact, did not sign the contract, specifically intending to delay again the date that the tickets were to be placed on sale. At the time of this meeting and in the presence of the above individuals, Mathias further purported to contact Audrey Booth at the Richmond Coliseum and order her to place the tickets on sale. Actually, Mathias did not contact Booth at that time.

Shortly after the June 23, 1980 meeting, Fox again approached Mathias. Mathias, however, refused to deal further with Fox and referred him to Johnson. Johnson signed the contract on June 24,

1980, but did not place the tickets on sale through the Ticketron outlets until approximately three days prior to the concert.

Fox asserts that each individual defendant was acting in his individual capacity and not within the scope of his employment. Based upon the foregoing factual allegations, Fox asserts the following claims in his amended motion for judgment:

## Count I

In Count I, Fox claims that he relied upon Deese's representations that Fox could hold the concert at City Stadium on July 4 and 5, 1980, if Fox complied with the terms and conditions set forth in Deese's handwritten notes. Relying upon these representations, Fox made certain financial commitments. Thereafter, Fox was advised that he would have to comply with additional requirements. Had Fox known of these additional requirements before he made the commitments, he would not have held the concert at City Stadium. By the time he learned of these new terms and conditions, however, he was unable to change his plans because of the obligations he had assumed.

Fox asserts that Deese "knew or should have known" of the additional requirements before Fox made the commitments. However, Deese "maliciously and in reckless disregard of [Fox's] rights, failed to disclose these facts to [Fox]." Fox alleges that Deese's acts amounted to "constructive and/or actual fraud, deceit or misrepresentation" and resulted in Fox sustaining economic loss of $137,500. Fox also seeks punitive damages of $100,000.

## Count II

In this count, Fox claims that Mathias represented to him that as of June 16, 1980, concert tickets were on sale. This representation was false; tickets were not placed on sale until July 1, 1980. Relying upon Mathias' representation, Fox expended approximately $27,000 in needless advertising.

Mathias also represented to Fox that it was City policy to pay the staff double time on July 4 and time and a half on July 5. This representation was false. Relying upon this misrepresentation, Fox, to his detriment, agreed to pay an additional sum of $3,173.42.

Fox alleges that Mathias knew or should have known that these representations were false. Consequently, Fox claims compensatory damages of $30,173.42 and punitive damages of $25,000.

## Count III

In Count III, Fox claims that Mathias, in an attempt to "either sabotage the concert and/or reduce the number of attendees, . . . maliciously and intentionally interfered with [Fox's] contract with the City . . . and [Fox's] prospective economic advantage." To support this claim, Fox alleges, *inter alia*, that Mathias intentionally delayed the preparation and execution of the contract, and intentionally delayed placing the tickets on sale. As a result, Fox claims compensatory damages of $637,500 and punitive damages of $250,000.

## Count IV

Count IV is a contract claim against the City. In this count, Fox claims that he was required to pay the salaries of 149 police officers for each concert day at a total cost of $32,520.78. In the written contract dated June 10, 1980, Fox had agreed to pay "all cost of City Police personnel for a minimum of 60 officers (more if required)." Fox asserts that "implicit in this provision is the requirement that the number of officers used will be selected in good faith based on the projected number of concert attendees based on advance [ticket] sales." Fox claims that 60 police officers would have been a reasonable number based on the small number of tickets sold by July 3, 1980. Because hiring 60 police officers would have cost him only $10,560, Fox claims that the City owes him $21,960.78, the amount he paid the additional 89 officers.

## Count V

This count is a claim against Mathias, Deese, and Johnson for violating Code §§ 18.2-499 and -500. Fox claims that these defendants, based upon the previously alleged facts, "combined, associated, agreed, mutually undertook and/or concerted together for the purpose of wilfully and maliciously injuring [him] in his trade, reputation, business and/or profession." For this, Fox seeks treble compensatory damages of $1,912,500 and $500,000 in punitive damages.

### Count VI

In Count VI, Fox claims that Mathias, Deese, and Johnson "conspired to maliciously and intentionally interfere with [Fox's] contract rights with the City . . . and his prospective economic advantage." In this count, Fox seeks compensatory damages of $637,500 and punitive damages of $500,000.

### Count VII

This count is a claim against the City for breach of contract. Fox alleges that under paragraph 12 of the June 10, 1980 written contract, the City had "complete and sole supervision of the sale of all tickets," that the City was obligated "to place tickets on sale in a reasonable manner and at a reasonable time prior to the . . . concert," and that "the agents and servants of the City . . . intentionally, maliciously and wilfully delayed the offering of tickets for sale until approximately three days prior to the concert, in violation of . . . the contract." In this count, Fox claims compensatory damages of $637,500.

### Count VIII

Count VIII is also a contract claim against the City. Pursuant to the contract, the City received $53,885 in ticket sales for the concert. The City also received deposits from Fox in the amount of $19,445. Fox alleges that the City is holding $73,330 of his money. Fox concedes, however, that he is indebted to the City in the sum of $33,951.59. Thus, he asserts that the City owes him $39,378.41. Fox has demanded payment of this sum, but the City has refused to pay it.

## II
## MISJOINDER OF PARTIES AND CAUSES OF ACTION.

### A
### Parties Plaintiff.

One of the grounds relied upon by the trial court for dismissing Fox's amended motion for judgment was the nonjoinder of parties plaintiff. All defendants asserted this defense.

Fox originally alleged under oath in a motion for judgment filed in a prior nonsuited action that he was "the principal planner and promoter" of the concert and that his "associates and partners in

the promotion of this event included Theodore Powell, John H. Martin and Alan Drewry." In the present action, however, Fox alleges only that he was "the principal planner and promoter" and makes no reference to "associates" or "partners."

The defendants contend that because Fox previously alleged under oath that he had "partners," he could not subsequently "maintain that he had no partners" and, therefore, the trial court properly dismissed this action for "failure of Fox's partners to join in as plaintiffs." We do not agree.

In his amended motion for judgment, Fox does not "maintain that he had no partners." He alleges, without more, that he "was the principal planner and promoter of the 'Mardi Gras' concert." This allegation is not necessarily inconsistent with the allegations contained in the prior motion for judgment.

Whether the court should have dismissed the action based on nonjoinder of parties plaintiff is answered by Code § 8.01-5(A) and Rule 3:9A. Code § 8.01-5(A) provides as follows:

> No action or suit shall abate or be defeated by the nonjoinder or misjoinder of parties, plaintiff or defendant, but whenever such nonjoinder or misjoinder shall be made to appear by affidavit or otherwise, new parties may be added and parties misjoined may be dropped by order of the court at any time as the ends of justice may require.

Rule 3:9A provides in pertinent part as follows:

> (a) *Persons to Be Joined if Feasible.* — A person who is subject to service of process may be joined as a party in the action . . . . If he should join as a plaintiff but refuses to do so, he may be made a defendant, or, in a proper case, an involuntary plaintiff.
>
> (b) *Method of Joinder.* — A motion to join an additional party shall, subject to the provisions of Rule 1:9, be filed with the clerk within twenty-one days after service of the motion for judgment and shall be served on the party sought to be joined who shall thereafter be subject to all provisions of these Rules, except the provisions requiring payment of writ tax and clerk's fees.

Clearly, the alleged nonjoinder of parties plaintiff was not a proper ground for dismissing this action. Indeed, if the defendants

had desired to pursue the matter, they and the trial court should have followed the procedures set forth in the statute and the rule for determining whether the purported partners were necessary parties.[3]

## B
### *Parties Defendant and Causes of Action.*

█ Another related ground relied upon by the trial court for dismissing Fox's amended motion for judgment was the alleged misjoinder of parties defendant and causes of action, a ground that all defendants asserted. On appeal, the defendants contend that Fox "is making claims against some of the defendants jointly as well as against them severally, and further that he is pursuing counts against different defendants for separate, independent acts." The defendants rely primarily upon *Norfolk Bus Term.* v. *Sheldon*, 188 Va. 288, 49 S.E.2d 338 (1948). In *Norfolk Bus Term.*, we stated that "under our system of pleading, unless the acts of independent tort-feasors concur in producing a single indivisible injury or damage, they may not be sued jointly in a single action." *Id.* at 296, 49 S.E.2d at 341.

█ *Norfolk Bus Term.*, however, was decided before the 1954 enactment of Code § 8.01-272 and before the 1974 enactment of Code § 8.01-281. Code § 8.01-272 provides in pertinent part:

In any civil action, a party may plead as many matters, whether of law or fact, as he shall think necessary. A party may join a claim in tort with one in contract provided that all claims so joined arise out of the same transaction or occurrence. The court, in its discretion, may order a separate trial for any claim.

Code § 8.01-281 provides in pertinent part:

A. A party asserting . . . a claim . . . may plead alternative facts and theories of recovery against alternative parties,

---

[3] In addition to filing a special plea of estoppel based on nonjoinder, Mathias and Johnson also filed a motion for joinder pursuant to Rule 3:9A. The trial court, however, sustained the special plea and did not rule on the joinder motion.

provided that such claims . . . so joined arise out of the same transaction or occurrence. . . .

    B. The court may, upon motion of any party, order a separate trial of any claim . . . and of any separate issue or of any number of such claims . . . .

In addition, Rule 1:4(k) provides in pertinent part:

    A party asserting . . . a claim . . . may plead alternative facts and theories of recovery against alternative parties, provided that such claims . . . arise out of the same transaction or occurrence. When two or more statements are made in the alternative and one of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the alternative statements. A party may also state as many separate claims . . . as he has regardless of consistency and whether based on legal or equitable grounds.

The foregoing statutes and rule represent a radical departure from the common-law pleading rule stated in *Norfolk Bus Term.. See also Tanner* v. *Culpeper C. Co.*, 117 Va. 154, 83 S.E. 1052 (1915); *McMullin* v. *Church*, 82 Va. 501 (1886).

    ■ We conclude that a fair reading of the amended motion for judgment shows that Fox has pleaded alternative theories of recovery against the same group of defendants and that the claims arise out of the same transaction or occurrence. Moreover, a trial court has the discretion to order a separate trial of any claim to attain the ends of justice. Code § 8.01-272. The trial court, therefore, erred in dismissing Fox's action on this ground.

### III
### SOVEREIGN IMMUNITY.

    ■ The trial court, applying the Doctrine of Sovereign Immunity, ruled that Deese, Mathias, and Johnson were immune from the tort claims Fox asserted against them. We conclude that, based upon the allegations in the amended motion for judgment, the trial court erred.

    The tort counts not only allege that these defendants committed *intentional* torts, but that they were acting outside the scope of their employment as well. Resolution of these allegations requires

an evidentiary hearing. The defendants are not immune if the evidence establishes that (1) they committed *intentional* torts, irrespective of whether they acted within or without the scope of their employment,[4] *Elder* v. *Holland*, 208 Va. 15, 19, 155 S.E.2d 369, 372-73 (1967), or (2) they acted outside the scope of their employment,[5] *see Messina* v. *Burden*, 228 Va. 301, 311, 321 S.E.2d 657, 662 (1984).

## IV
## ESTOPPEL.

In his previous motion for judgment filed in the nonsuited action, Fox alleged that "Deese convened, attended and acted as a principal party on behalf of the City . . . in a series of meetings with [Fox] and others beginning in May, 1980, and continuing into the Autum [sic] of 1980." In the amended motion for judgment filed in the case at bar, however, Fox asserts that when Deese committed the alleged intentionally tortious acts, Deese was acting outside the scope of his employment with the City. Deese therefore contends, and the trial court ruled, that Fox is estopped from proceeding against him in his individual capacity because Fox has assumed inconsistent positions.

In a similar vein, Mathias contends that Fox did not allege sufficient facts in Count II of the amended motion for judgment to establish a cause of action for misrepresentation against Mathias in his individual capacity. Mathias argues that "[a] review of all allegations in Count II establishes that [he] was dealing with Fox only as a City . . . official."

To support this argument, Mathias points to two allegations in the amended motion for judgment. One allegation states that Mathias "was Acting Director of the Department of Community Facilities . . . until on or about June 23, 1980." The other allegation

---

[4] Although this principle applies to most intentional torts, it is not necessarily applicable to all. *See* discussions at Sections VII and VIII *infra*.

[5] The individual defendants contend that Fox has failed to allege factual matter to support his claim that they were acting outside the scope of their employment with the City. The defendants advance primarily two arguments in support of their contention. They assert that (1) Fox's claim is merely conclusional, and (2) he has taken inconsistent positions in his pleadings on the subject. We have considered the defendant's arguments and reject them. Giving proper deference to our rules governing pleadings, especially Rule 1:4(k), we conclude that Fox's amended motion for judgment contains allegations sufficient to withstand the demurrers and special pleas.

states that "Mathias was acting in his individual capacity and not within the scope and course of his employment." Mathias asserts that these two allegations are "clearly inconsistent and contradictory."

■ We cannot say that these allegations against Deese and Mathias are irreconcilably inconsistent. Conceivably, Fox could present evidence to establish that although Deese and Mathias appeared to act for the City, they in fact had left the scope of their employment and had acted on their own accounts.

Moreover, the determination whether Mathias and Deese were acting outside the scope of their employment is not necessarily the sole test for adjudicating their individual liability. Even if they acted within the scope of their employment, they can be held liable for an *intentional* tort. *See Elder*, 208 Va. at 19, 155 S.E.2d at 372-73. Fox claims in Count I that Deese committed the intentional tort of fraud, and he asserts in Count II that Mathias intentionally misrepresented facts about the ticket sales and the City's pay policy. We hold, therefore, that the trial court erred in sustaining the defendants' pleas of estoppel.

## V

## WAIVER.

Deese contends in one ground of his demurrer that by entering into the written contract, Fox waived his claim of fraud, misrepresentation, and deceit as set forth in Count I of the amended motion for judgment. We do not agree.

■ Waiver is the voluntary, intentional abandonment of a known legal right, advantage, or privilege. *Employers Ins. Co.* v. *Great American*, 214 Va. 410, 412-13, 200 S.E.2d 560, 562 (1973); *Coleman* v. *Nationwide Life Ins. Co.*, 211 Va. 579, 583, 179 S.E.2d 466, 469 (1971). "[B]oth knowledge of the facts basic to the exercise of the right and the intent to relinquish that right are essential elements." *Great American*, 214 Va. at 412-13, 200 S.E.2d at 562.

Relying upon Deese's allegedly false representation, Fox made financial commitments in excess of $140,000. Fox had been instructed to obtain written commitments from the performers, and he did so. By the time Fox learned of the additional requirements, he was unable to change his plans or cancel his commitments. In view of these allegations, we cannot say as a matter of law that by

entering into the written contract, Fox voluntarily and intention-
ally abandoned a known legal right.[6]

## VI
## OTHER DEFENSES ASSERTED BY DEESE.

### A
### *Present or Preexisting Facts.*

■ Deese contends that the representation he allegedly made to
Fox as set forth in Count I was a statement relating to future
events and not to present or preexisting facts. Again, we disagree.

In Count I, Fox alleges that Deese knowingly concealed the ad-
ditional requirements and did not disclose them to Fox until Fox
had made the financial commitments. If this were so, then Deese
misrepresented present or preexisting facts.

> [T]he state of the promisor's mind at the time he makes the
> promise is a fact, and . . . if he represents his state of mind
> . . . as being one thing when in fact his purpose is just the
> contrary, he misrepresents a then existing fact.

*Lloyd v. Smith*, 150 Va. 132, 145-46, 142 S.E. 363, 366 (1928).
*Accord Boykin v. Hermitage Realty*, 234 Va. 26, 29-30, 360
S.E.2d 177, 178-79 (1987).

### B
### *Proximate Cause.*

Deese also contends that the alleged misrepresentation was not
the proximate cause of Fox's actual economic loss of $137,500.
Deese points to paragraph 41 of the amended motion for judg-
ment, in which Fox asserts "[t]hat had . . . Mathias placed the
tickets on sale as promised, the concert would have been a success
and [Fox] would have realized $500,000.00 in profit." Deese as-
serts that, under Fox's theory of the case, it was Mathias' inter-

---

[6] If Deese is claiming an "implied waiver" (which is "more precisely an estoppel ap-
plied," *Great American*, 214 Va. at 413, 200 S.E.2d at 562-63), we also reject his conten-
tion. When an "implied waiver" is relied upon, the intention to waive a right must be
proved by clear and unmistakable evidence. *Coleman*, 211 Va. at 583, 179 S.E.2d at 469;
*Roenke v. Va. Farm Bureau Ins. Co.*, 209 Va. 128, 135, 161 S.E.2d 704, 709 (1968); *May
v. Martin*, 205 Va. 397, 404, 137 S.E.2d 860, 865 (1964); *Creteau v. Phoenix Assurance
Co.*, 202 Va. 641, 644, 119 S.E.2d 336, 339 (1961). Because such a defense requires clear
proof, the trial court erred in sustaining Deese's demurrer on this ground.

vening tortious conduct that caused Fox's loss, not Deese's alleged misrepresentation.

Fox counters with the argument that had Deese made a full disclosure of the requirements, there would have been no contract in the first instance and, thus, Fox would not have sustained a loss. Fox asserts that he does not seek relief in Count I for lost profits, but only recovery of his actual economic loss.

As previously noted, "[a] party may . . . state as many separate claims . . . as he has regardless of consistency." Rule 1:4(k). Moreover, proximate cause is ordinarily an issue for the fact finder, *S & C Company* v. *Horne*, 218 Va. 124, 131, 235 S.E.2d 456, 461 (1977), and a plaintiff need not show that an act is the only cause of his damages, *Schools* v. *Walker*, 187 Va. 619, 629, 47 S.E.2d 418, 423 (1948).

## VII
## CLAIM AGAINST MATHIAS OF INTENTIONAL INTERFERENCE.

In Count III, Fox alleges that Mathias maliciously and intentionally interfered with his contract with the City and with his prospective economic interests. Mathias again asserts that he was acting within the scope of his employment with and on behalf of the City and therefore cannot be liable for interfering with the contract.

The determination of whether Count III states a cause of action turns on the resolution of the scope of employment question. A person cannot intentionally interfere with his own contract. *See Chaves* v. *Johnson*, 230 Va. 112, 120, 335 S.E.2d 97, 102 (1985). Thus, if an evidentiary hearing establishes that Mathias was acting within the scope of his employment, then he was an agent of the City. In that case, the City's contract was also his contract, and he could not interfere with it.

If, however, the evidence shows that Mathias was acting outside the scope of his employment, Fox must establish the prima facie elements of tortious interference with a contract as set forth in *Chaves*, 230 Va. at 120-21, 335 S.E.2d at 102-03, to state a cause of action under Count III. Once a prima facie showing is made, the burden of proof shifts to Mathias to show the affirmative defense of justification or privilege. *Id*. at 121, 335 S.E.2d at 103.

## VIII
## CONSPIRACY CLAIMS AGAINST DEESE, MATHIAS, AND JOHNSON.

### A
### *Conspiracy to Harm Fox's Business.*

Count V is a claim that Deese, Mathias, and Johnson conspired to injure Fox in his trade, business, or occupation in violation of Code §§ 18.2-499 and -500. Again, these defendants argue that they were acting within the scope of their employment. Because they were acting as agents and employees of the City, they assert that "no conspiracy or combination . . . exists as a matter of law."

To recover in an action for conspiracy under Code §§ 18.2-499 and -500, Fox must prove "(1) *a combination of two or more persons* for the purpose of willfully and maliciously injuring [him] in his business, and (2) resulting damage to [him]." *Allen Realty Corp.* v. *Holbert*, 227 Va. 441, 449, 318 S.E.2d 592, 596 (1984) (emphasis added). *See also Greenspan* v. *Osheroff*, 232 Va. 388, 351 S.E.2d 28 (1986).

If the defendants were acting within the scope of their employment and, therefore, were agents of the City, then only one entity exists — the City. By definition, a single entity cannot conspire with itself. However, as we previously have noted, whether the defendants were acting within the scope of their employment is an issue that requires an evidentiary hearing.

### B
### *Conspiracy to Interfere with Fox's Contract Rights.*

#### 1.  *Scope of employment.*

In Count VI, Fox alleges that Deese, Mathias, and Johnson maliciously and intentionally conspired to interfere with his contract rights with the City and his prospective economic advantage. The defendants again raise the scope of employment argument, the resolution of which, as we have said, requires an evidentiary hearing.

Although a party to a contract can be held liable for conspiring to breach his own contract, *Worrie* v. *Boze*, 198 Va. 533, 540, 95 S.E.2d 192, 198 (1956), such a conspiracy requires the party to the contract to unite with a third person in effecting the

breach of the contract. *Id*. at 541, 95 S.E.2d at 199. Thus, this claim, like the Code §§ 18.2-499 and -500 conspiracy claims asserted under Count V, requires an evidentiary hearing on the scope of employment question.

### 2. *Failure to allege that interference caused breach.*

Another ground of demurrer to Count VI asserted by Deese, Mathias, and Johnson is that Fox failed to allege that their tortious conduct caused a breach of Fox's contract with the City. The defendants contend that no cause of action can be maintained for tortious conspiracy to interfere with a contract unless a breach of contract resulted from the interference.

One of the requisite elements of the tort is proof that a defendant intentionally interfered with the contract or expectancy and that the interference induced or caused a breach of the contract or a termination of the expectancy. *See Duggin* v. *Adams*, 234 Va. 221, 226, 360 S.E.2d 832, 836 (1987); *Chaves*, 230 Va. at 120, 335 S.E.2d at 102; *Worrie*, 198 Va. at 540, 95 S.E.2d at 198-99. Because Fox failed to allege that the defendants' interference induced or caused the breach of Fox's contract with the City, the trial court properly sustained this ground of the defendants' demurrers.

As previously noted, however, the trial court sustained all grounds of the demurrers "without leave to amend." Fox, therefore, never was afforded the opportunity to move to amend. "Leave to amend [a pleading] shall be liberally granted in furtherance of the ends of justice." Rule 1:8.

We conclude that the trial court abused its discretion by not affording Fox the opportunity to amend. On remand, Fox, upon proper motion, should be permitted to amend.

### IX
### CONCLUSION.

For the foregoing reasons, we will reverse the judgment of the trial court and remand the entire case for further proceedings consistent with the views expressed herein.

*Reversed and remanded.*